# UNITED STATES DISTRICT COURT

### for the
### Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  2:21-mj-05503 |
| 4257 E. Ocean Boulevard, Long Beach, California 90803 (the "Subject Premises") | ) ) ) ) ) | |

FILED
CLERK, U.S. DISTRICT COURT

11/17/2021

CENTRAL DISTRICT OF CALIFORNIA
BY:   KL   DEPUTY

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution and possession with intent to distribute a controlled substance |
| 21 U.S.C. § 846 | Conspiracy to distribute and possess with intent to distribute a controlled substance |
| 21 U.S.C. § 843 | Unlawful use of a communication facility (including the mail) to facilitate the distribution of a controlled substance |
| // | |
| // | |
| // | |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of ___ days (giving exact ending date if more than 30 days: ___) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Corey R. Dunphy
_____
*Applicant's signature*

SA Corey R. Dunphy
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   November 17, 2021

*Alicia G. Rosenberg*
_____
*Judge's signature*

City and state: Los Angeles, CA

Hon. Alicia G. Rosenberg, United States Magistrate Judge
_____
*Printed name and title*

AUSA: Samuel J. Diaz (213) 894-3045

## AFFIDAVIT

I, Corey R. Dunphy, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.   I am a Special Agent with the United States Postal Service Office of the Inspector General ("USPS OIG").  I am an "investigative or law enforcement officer" of the United States within the meaning 18 U.S.C. § 2510(7) and a federal law enforcement officer under Fed. R. Crim. P. 41(a)(2)(C).  I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 3061.

2.   I am assigned to the USPS OIG Pacific Area Field Office, where I have been employed since May 2005.  Previously, I was a Special Agent at the U.S. Department of State beginning in July 2002 until I joined the USPS OIG.  I have a master's degree in Business Administration, a bachelor's degree in International Business, and I am an accredited Certified Fraud Examiner.  I completed the criminal investigator training program at the Federal Law Enforcement Training Center.

3.   I have attended several training courses related to identity theft, money laundering, bitcoin and cryptocurrency, the dark web, cell phone investigations, controlled substances, and asset forfeiture.

4.   My current duties include investigating violations of the federal Controlled Substance Act and related offenses and assisting in law enforcement investigations with the US Postal Inspection Service.  I have also been trained regarding the

investigation of individuals and drug trafficking organizations that use the U.S. mail to transport controlled substances and proceeds from their sale including 40 hours of narcotics training held by the USPS OIG specific to the use of the U.S. mail in narcotics trafficking.

## II. **PURPOSE OF AFFIDAVIT**

5.   This affidavit is made in support of a search warrant for 4257 E. Ocean Boulevard, Long Beach, California, 90803 (the "SUBJECT PREMISES") described in Attachment A, for the items to be seized described in Attachment B.

6.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. **PREMISES TO BE SEARCHED**

7.   The premises to be searched is the SUBJECT PREMISES described in Attachment A, which is incorporated herein by reference.

## IV. **ITEMS TO BE SEIZED**

8.   The items to be seized are the evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (distribution and possession with intent to

distribute a controlled substance), 846 (conspiracy to do the same), and 843(b) (unlawful use of a communication facility (including the mail) to facilitate the distribution of a controlled substance) (collectively, the "Subject Offenses"), as described in Attachment B, which is incorporated herein by reference.

## V.  <u>SUMMARY OF PROBABLE CAUSE</u>

9.   Since at least February 2021, law enforcement has been investigating Harold CAMPBELL ("CAMPBELL"), Karmelita Prado ("PRADO"), and David Chang ("CHANG"), in relation to a scheme involving the distribution of controlled substances through the use of U.S. mail.

10.  CAMPBELL, PRADO, and CHANG sent US mail which contained cocaine ("Drug Parcels"), at U.S. post offices located in Long Beach, California, in the Central District of California, to addresses in Chesapeake, Virginia.

11.  Law enforcement intercepted some of these Drug Parcels sent by CAMPBELL and PRADO to addresses in Chesapeake, Virginia and found that the parcels contained cocaine.

12.  Law enforcement learned that CHANG mailed suspected Drug Parcels to addresses in Chesapeake, Virginia.

13.  The proceeds from the sale of cocaine were sent in the US mail ("Money Parcels") and delivered to the SUBJECT PREMISES, which is occupied by CHANG.

14.  Law enforcement obtained communications between CAMPBELL and CHANG which demonstrated a collaborative effort to

3

collect the proceeds from the sale of controlled substances
which was sent in the US mail to the SUBJECT PREMISES.

15.   Accordingly, I believe that the SUBJECT PREMISES has
been used, and continues to be used, to market, sell, and
facilitate the distribution of controlled substances through the
mail and facilitate delivery of proceeds, and evidence of the
Subject Offenses will be found in the SUBJECT PREMISES.

VI. **STATEMENT OF PROBABLE CAUSE**

16.   Based on my review of law enforcement reports provided
by USPS OIG Special Agent Jessica Farrell, agents from the U.S.
Drug Enforcement Agency, my personal observations, my review of
evidence, and my conversations with other law enforcement
officers who were involved in this investigation, I have learned
the following:

A.    **USPIS Conducts Interdiction Program to Combat Drug
      Trafficking through Overnight Delivery Services**

17.   In an effort to combat the flow of controlled
substances through the overnight delivery services, the U.S.
Postal Inspection Service ("USPIS") has established interdiction
programs in areas throughout the United States.  Some of these
areas, including Southern California, have been identified as
known sources of controlled substances.  The USPIS conducted an
analysis of parcels mailed which were found to contain
controlled substances or proceeds or payments of sales of
controlled substance.  This analysis has established a series of
characteristics which, when found in various combinations, have
been indicative of parcels that contain controlled substances or

4

the proceeds or payments of sales of controlled substances.
These characteristics include:

> a.   the parcel was mailed from or addressed to a controlled substance source city;

> b.   the parcel sender name is unknown at the return address or the sender address is incomplete;

> c.   the parcel delivery name is unknown at the delivery address or the delivery address is incomplete;

> d.   the parcel has handwritten address information;

> e.   the parcel is wrapped in brown paper and/or heavily taped; and

> f.   the ZIP Code from where the parcel is mailed is different than the ZIP Code used in the return address;

> g.   the parcel postage was excessive or deficient; and

> h.   the affixed postage was generated prior to USPS acceptance.

18.   During the course of my duties and through training and experience I have learned to conduct label analysis on parcels being shipped to or from this district that contain the same characteristics on previous investigated parcels that contained controlled substances and controlled substance proceeds.

**B.   In March 2021, USPS OIG Discovered Suspicious Mailing of Priority Mail Parcels from California to Virginia**

19.   On March 1, 2021, the USPS OIG Research and Insight Solutions Center ("RISC") identified a suspicious pattern of mailing activity.  A national review of USPS parcel shipments

revealed an abnormally large quantity of Priority Mail parcels in which postage was paid in cash, originated in California, and were addressed to various residences on USPS mail delivery route R083 in Chesapeake, Virginia (the "Virginia addresses").

20.  As California was known as a source state for the shipment of controlled substances in the US mail and as from agency training and experience, the ongoing use of cash to pay for postage was an indicator the mailer may wish to shield their identity, delivery route R083 and the USPS employee assigned this route, were further reviewed.

21.  From my knowledge and experience and the knowledge and experience of law enforcement officers who investigate narcotics trafficking, individuals engaged in narcotics trafficking in the US mail often recruit USPS employees ("Collusive USPS Employees") to provide route addresses for use in the mailing of controlled substances, and to collect Drug Parcels as they arrive for delivery, and divert these Drug Parcels to the scheme participants, all in an effort to shield those engaged in narcotics trafficking from law enforcement and provide a level of insulation should law enforcement detect the scheme.

22.  On March 5 and March 29, 2021, a Collusive USPS Employee assigned to delivery route R083 was observed stopping in front of the Virginia addresses, scanning a suspicious parcel within his postal vehicle, and continuing on without delivering the suspicious parcel to its intended address.  Tracking information revealed the package was scanned delivered.

23.   The Collusive USPS Employee and deliveries on delivery
route R083 were subjected to additional scrutiny because: the
Collusive USPS employee created false electronic delivery
records for parcels picked up at the Virginia addresses, in
violation of USPS policy; postage for those parcels was paid for
in cash; the parcels were sent from California, a known source
state of controlled substances; and the parcels were shipped
with Priority Mail.

**C.   PRADO and CAMPBELL Engage in Drug Trafficking Scheme
Involving the Sending of Parcels Containing Drugs and
Drug Proceeds Via US Mail**

24.   On September 16, 2021, CAMPBELL mailed parcel number
9505513493551259412785 ("Parcel 412785") to an address on
delivery route R083.  The shipping label was handwritten with
the Sender Name and Sender Address, "MR ROBERT CHANEY 711
PACIFIC COAST HIGHWAY, HUNTINGTON BEACH, CA 92648" and the
Delivery Name and Delivery Address was "MS RHONDA CHANEY BURNS
524 FALLEN LEAF LN, CHESAPEAKE, VA 23320."  A review of a law
enforcement database revealed no records of the Sender Name at
the Sender Address and no record of the Delivery Name at the
Delivery Address.  From my knowledge and experience, I know
individuals engaged in trafficking of controlled substances
often use fictitious Sender Name and Sender Address and unknown
Delivery Name at the Delivery Address in an effort to create
deniability should law enforcement investigate.  As the postage
for the Priority Mail was paid with cash, the parcel was sent to
an address on delivery route R083, a route controlled by a
Collusive USPS Employee, had a fictitious Sender Name and Sender

Address and there was no record of the Delivery Name at the
Delivery Address, law enforcement intercepted the parcel.
Pursuant to a warrant, the parcel was found to contain
approximately 1.7 kilograms of cocaine.  I learned that the
individual who mailed the parcel was CAMPBELL after I obtained
and shared images from the Post Office security camera at the
time of the mailing with a law enforcement officer who knew
CAMPBELL.  The law enforcement officer positively identified
CAMPBELL as the individual who appeared in the Post Office
video.

25.  As Parcel 412785 was found to contain cocaine, law
enforcement officers now believed other Priority Mail parcels
addressed to delivery route R083, which were mailed from
California, postage paid with cash, had a fictitious Senders
Name and Sender Address, and there was no record of the Delivery
Name at the Delivery Address, may in fact be Drug Parcels and
contain cocaine.

26.  On October 18, 2021, PRADO mailed suspected Drug
Parcels 9505513493511291584734, 9505516212531291801516 (Parcel
"801516") and 9505513493511291584727 to addresses on delivery
route R083.  Pursuant to a warrant, law enforcement seized
Parcel 801516 and found it contained approximately one kilogram
of cocaine.  I learned that the individual who mailed the parcel
was PRADO after I obtained and shared images from the Post
Office security camera at the time of the mailing with a law
enforcement officer who knew PRADO and the law enforcement

officer positively identified PRADO as the individual who appeared in the Post Office video.

27.  Law enforcement arrested CAMPBELL on October 22, 2021, in Virginia Beach, VA, after a law enforcement operation in which the Collusive USPS Employee delivered Parcel 1801516 to CAMPBELL.  PRADO was present during this law enforcement operation but managed to evade arrest but left behind her identification cards, which were seized by law enforcement and used to later identify her.

**D.  Law Enforcement Discovered That CHANG Is a Participant in PRADO and CAMPBELL's Drug Trafficking Scheme and Uses the SUBJECT PREMISES to Promote the Scheme**

28.  Law enforcement seized CAMPBELL'S cellphone and pursuant to a warrant, and found calls and direct messages which appeared to be exchanged with CHANG discussing the distribution and sale of controlled substances and proceeds therefrom.

29.  On or about September 23, 2021, "Dave Cali" direct messaged ("DM") CAMPBELL "Call me when u can.. it's about money" and CAMPBELL replied "Ok I'm bussing this play with my guy will do" and Dave Cali sent an image of a Notice of Seizure of Property.

30.  The Notice of Seizure of Property is a USPIS letter mailed to individuals when a parcel is found to contain suspected prohibited items.  In this instance the letter was addressed to CHANG at the SUBJECT PREMISES and stated that on September 15, 2021, a Priority Mail parcel was intercepted in the City of Industry, California after being found to share characteristics with parcels known to contain controlled

substances or proceeds.  The parcel was searched pursuant to a warrant and found to contain $68,865 in US currency.

31.  CAMPBELL replied to Dave Cali stating "I'm sorry brother from my heart I love u and never want to lose our friendship" and "But I will never shit on u" and Dave Cali replied "All good, it's on me man.. I love u like we blood" and "I'm actually happy . . . no more murder on my mind… with the mailman" and "he's a good kid."

32.  Law enforcement searched CAMPBELL's phone contacts for "Dave Cali" and found the subscriber phone number (714) 306-4971.  A query of a law enforcement database for this subscriber phone number revealed the subscriber was CHANG.

33.  I searched a law enforcement database for CHANG at the SUBJECT PREMISES and found a record.  I subsequently searched for an obtained an image of CHANG from a record maintained at the State of California Department of Motor Vehicles.

34.  From my knowledge and experience in this investigation I believe "Dave Cali" is CHANG and I know law enforcement seized a Money Parcel inbound to the SUBJECT PREMISES on August 4, 2021, which contained $68,865 and mailed the notice to the SUBJECT PREMISES, and as CHANG possessed this letter and transmitted its image to CAMBPELL, I believe CAMPBELL and CHANG were the intended recipients of these funds and I am also aware the expression "bussing this play" is terminology used in the sale of controlled substances to describe when a buyer and seller of controlled substances are nearly done with negotiations.

35.   I know from my training and experience that individuals engaged in trafficking of controlled substances often communicate by text, DM, and phone calls in furtherance of their criminal activities.

36.   I searched for and subsequently found a U.S. Department of Homeland Security record where on both November 23, 2020, and on March 1, 2021, PRADO, CAMPBELL and CHANG, crossed the border into Mexico together in a motor vehicle.   I know from my training and experience that Mexico is a source country for illicit drugs, including cocaine, and as PRADO, CAMPBELL and CHANG had traveled together on two occasions into Mexico, this further solidified law enforcement's belief the three individuals worked together to traffic cocaine.

37.   I obtained and reviewed USPS records and learned that CHANG receives mail at the SUBJECT PREMISES.

38.   A review of USPS records revealed that between March 31, 2021 and July 21, 2021, twenty-six US mail parcels were delivered to the SUBJECT PREMISES.   Upon further review, I found postage was paid with cash, the shipping class was Priority Mail, and that twelve of these were sent from Virginia.   From my knowledge and experience in this investigation and my training related to the identification of characteristics of mail which contained controlled substances or proceeds, and as a Money Parcel addressed to the SUBJECT PREMISES was seized by law enforcement, I believe the twelve Priority Mail parcels with postage paid in cash, which were sent from Virginia, were in fact Money Parcels related to this scheme.

39.  I know from my knowledge and experience that individuals engaged in trafficking of controlled substances in the US mail who receive Money Parcels may retain remnants or packing materials related to these parcels as a means of recordkeeping and believe that these remnants may be retained in the SUBJECT PREMISES.

40.  On October 6, 2021, CHANG mailed suspected Drug Parcel 9505516212531279796841 to an address on delivery route R083.  I obtained and reviewed the images from the Post Office security camera at the time of the mailing with an image of CHANG from the State of California database and after I compared the images and believe the individual who mailed the parcel was CHANG.

41.   On October 7, 2021 CHANG mailed parcels 9505516212531280797806 ("Parcel 797806") and 9505516212531280797813 ("Parcel 797813").  I obtained the USPS security video of the individual who mailed the parcels and compared the video to the image from the State of California Department of Motor Vehicles image of CHANG and for this reason I believe the individual who mailed these parcels was CHANG.  I obtained and reviewed USPS records for Parcel 797806 and observed that the Sender's Information was listed as "JOSEPH FREEMAN 5234 OLIVA AVE LAKEWOOD CA 90712" and the delivery address was "SEBASTIN WOODWARD 1315 AUBURN HILL DR CHESAPEAKE, VA 23320," and for 797813 the Sender's Information was listed as "AUNTY SUSAN CLEMAN 11765 EDINGER AVE FOUNTAIN VALLEY CA 92708" and the deliver address was "RITA COLEMAN, 1354 AUBURN HILLS, CHESAKEAKE, VA 23320."  A review of a USPS database revealed the

Delivery Address for both Parcel 797806 and Parcel 797813 was on delivery route R083.  I searched a law enforcement database for the Sender's Name and Address, to wit ""JOSEPH FREEMAN 5234 OLIVA AVE LAKEWOOD CA 90712" and "AUNTY SUSAN CLEMAN 11765 EDINGER AVE FOUNTAIN VALLEY CA 92708" and found no record assigned for the Sender's Name at these addresses.  I searched a law enforcement database for the delivery name and address, to wit "SEBASTIN WOODWARD 1315 AUBURN HILL DR CHESAPEAKE, VA 23320" and "RITA COLEMAN, 1354 AUBURN HILLS, CHESAKEAKE, VA 23320" and found no record assigned for the delivery name at the address.

42.  As I know law enforcement intercepted Drug Parcels intended for delivery to fictitious customers on delivery route R083, and as CHANG mailed Parcels 797806 and 797813, which were addressed with a fictitious Sender Name and an unknown Delivery Name at the Delivery Address, and paid cash for Priority Mail postage, and CHANG was in communication with CAMPBELL regarding topics I recognized to be related to distribution of controlled substances and proceeds, I believe Parcels 797806 and 797813 were likely Drug Parcels.

43.  I know from my training and experience the USPS issues customer receipts for transactions and that these receipts include the date of service, the USPS location, product tracking number, pricing and details of other services provided.  I also know that individuals engaged in the trafficking of controlled substances in the US mail may retain these USPS receipts as proof of shipment and safeguard these items in a location under their care and control such as the SUBJECT PREMISES.

44.  From my knowledge and experience I know individuals engaged in distribution of controlled substances in the US mail use packaging material such as USPS boxes, bubble wrap, shipping labels, and chemical spray to mask the odor of the controlled substances, and often maintain a surplus inventory for future orders, and the process of assembling these orders often takes place in an area where the abettors have privacy from the public and can avoid detection by law enforcement, sometimes in private residences such as the SUBJECT PREMISES, and as CHANG mailed multiple suspected Drug Parcels, I believe additional packaging materials and controlled substances may be found inside the SUBJECT PREMISES.

45.  A review of USPS records revealed that between February 2, 2021, and July 31, 2021, sixty-five suspected Drug Parcels with a total combined weight of 213 pounds, believed to be associated a drug-trafficking organization run by CAMPBELL, PRADO and CHANG, were interdicted in US Post Offices in Long Beach, California en route to addresses on delivery route R083.

46.  On October 1, 2021 and November 16, 2021, law enforcement officers conducted surveillance and observed CHANG as he entered the SUBJECT PREMISES.  During the November 16, 2021 surveillance, law enforcement observed CHANG as he utilized two cellular telephones intermittently to conduct telephone calls and to transmit text messages.  During the surveillance, law enforcement observed that CHANG did not knock or wait to gain entry into the SUBJECT PREMISES and for that reason, as well as the fact that CHANG receives mail at the SUBJECT

PREMISES, as discussed above, law enforcement believes CHANG is the occupant of the SUBJECT PREMISES.

### VII. TRAINING AND EXPERIENCE ON DRUG OFFENSES

47. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

48. Individuals engaged in the illegal sales of narcotics often keep records and evidence of such conduct at their residences. Such evidence can be found in the form of, but not limited to, the following items: pictures, receipts, handwritten ledgers (e.g., pay-owe sheets), and cellular telephones and other digital devices. Since residences are where these individuals often spend most of their time, it is common to find evidence of their illegal activities, including their digital devices, in their residences.

49. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

50. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained

where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

51.  Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

52.  Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

53.  Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles and residences in the event of an unexpected opportunity to sell narcotics arises.

54.  Drug traffickers often maintain on hand large amounts of United States currency to finance their ongoing drug

trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

55.  Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

56.  It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

### VIII.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

57.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such
*(footnote cont'd on next page)*

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

58.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

59.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

---

as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

60. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

61. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

62. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

63. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult

to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

64.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

65.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

66.  Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

67.  In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the

opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

68.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress CHANG'S thumb and/or fingers on the device(s); and (2) hold the device(s) in front of CHANG'S face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature

69.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX. CONCLUSION

70.  Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found at the SUBJECT PREMISES, as described in Attachment A.


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this _17th_ day of _November_, 2020.

_Alicia G. Rosenberg_

UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

PREMISES TO BE SEARCHED

The premises located at 4257 E. Ocean Boulevard, Long Beach, California 90803 (the "SUBJECT PREMISES").  The SUBJECT PREMISES is situated among six three-story duplex structures on the eastern side of the street, at a nearby intersection is a street sign for "Ocean Blvd 4200E."  The structure has white stucco walls, and a brown barrel tile roof.  On the ground level there is a private entrance with a brown wooden front door.  To the right of the front door is a placard with the numbers "4257," and an enclosed patio area.  The second and the third level have balconies, and the rear of the property is situated on an access road, with a gated two-car garage on the ground level and a balcony on the second level.

The warrant extends to the entirety of the SUBJECT PREMISES, including the residence, all rooms, attics, basements, garages, storage areas, safes, containers, trash areas, trash containers, and surrounding areas, and to all buildings, structures, vehicles, and appurtenances on the curtilage of the SUBJECT PREMISES.

Image of SUBJECT PREMISES



## ATTACHMENT B

### I. ITEMS TO BE SEIZED

1.    The items to be seized are fruits, instrumentalities, and evidence of violations of Title 21, United States Code, Sections 841(a)(1) (distribution and possession with intent to distribute a controlled substance), 846 (conspiracy to do the same), and 843(b) (unlawful use of a communication facility (including the mail) to facilitate the distribution of a controlled substance) (collectively, the "Subject Offenses"), namely:

a.    Any controlled substance, controlled substance analogue, or listed chemical;

b.    Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c.    Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

d.    United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages

over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

    e.   Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

    f.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

    g.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

h.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

i.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

j.   Contents of any calendar or date book;

k.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

l.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

m.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created,

modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II. SEARCH PROCEDURE FOR DIGITAL DEVICES

4.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall

complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

vi

d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

      f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

      g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress David CHANG's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of David CHANG's face with his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

      a.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.